## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**MICHAEL L. TURNER,**

                **Plaintiff,**

     **v.**

**FEDERAL LAW ENFORCEMENT
TRAINING CENTER,** *et al.,*

                **Defendants.**

**Civil Action No. 04-0606 (HHK)**

---

## MEMORANDUM OPINION

When a person is employed as a United States Park Police Officer, he must complete a

training program conducted by the Federal Law Enforcement Training Center ("FLETC") in

Glynco, Georgia.  In this action, plaintiff Michael Turner ("Turner"), who is Black, alleges that

his removal from the FLETC training program after his involvement in a physical altercation

with three White recruits was motivated by racial animus in violation of federal civil rights laws,

specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*, and

42 U.S.C. § 1981.[1]  First Amd. Compl. at 4 (Count I).  Turner also asserts causes of action for

---

[1]     Actually, Turner's amended complaint recites that some of his claims are based upon "the Civil Rights Act of 1871."  Amd. Compl. at 4 (Count I).  The court is not familiar with the law to which Turner refers, and he does not provide a citation for any such enactment.  The court presumes that Turner means to refer to 42 U.S.C. § 1981, a well-known civil rights statute which prohibits intentional race discrimination in the making and enforcing of contracts with both private and public actors.  42 U.S.C. § 1981(a), (c).  The statute's protection extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.* § 1981(b).

Wrongful Discharge (Count II), Negligent Accounting (Count III), and Disparate Treatment (Count IV).  *Id.* at 5-6.  Before the court is defendants' motion to dismiss and for summary judgment ("Defs.' Mot.") [Dkt. #34].  The only claims to warrant extended discussion are those alleging that Turner's removal from FLETC training was motivated by racial animus in violation Title VII and the 42 U.S.C. § 1981.[2]  Having considered the motion, Turner's opposition thereto, and the record of this case, the court concludes that defendants are entitled to summary judgment.

## I.   BACKGROUND

The United States Park Police ("USPP") hired Turner as a police officer recruit in October 2001.  After completing a week-long orientation, he began the FLETC training program in Glynco, Georgia as a member of class USPPI-202.  According to Turner, he had finished a substantial portion of the program when injuries to his right wrist and fingers sustained during a training exercise prevented him from completing training program.  He then returned to Washington, D.C. and worked in the USPP's property office and in its training branch.  Turner returned to FLETC in July 2003 as a member of class USPPI-304.  During the class orientation he met his classmates, among whom were Sean D'Augostine, Louis Facciponti, and Erick May.

On November 8, 2003, at approximately 11:30 p.m., there was a physical altercation involving Turner, D'Augostine, Facciponti and May in D'Augostine's dormitory room.  Certain

---

[2]      As defendants correctly point out, to the extent Turner's "Wrongful Discharge" claim is not a part of his Title VII or § 1981 claim, it fails because it is an allegation of an adverse employment action subject to exclusive review by the Merit System Protection Board.  *See* 5 U.S.C. § 7703 (2005).  His claim for "Negligent Accounting," to the extent it states a cause of action at all, fails because Turner has not satisfied certain requirements of the the Federal Tort Claims Act, *see* 28 U.S.C. § 2675 (2005), which would govern such an action.  One such requirement is that a plaintiff file an administrative claim before he files suit in federal court.  *McNeil v. United States*, 508 U.S. 106, 113 (1993).  Nothing in the record indicates that Turner filed an administrative claim, and any claim under the Federal Tort Claims Act would be barred.  *See id.*

facts about the altercation are not in dispute.  D'Augostine was sitting on his bed, Facciponti was

sitting in a chair, and May was standing in the open doorway to D'Augostine's room when

Turner came to the room to discuss comments that had been made to him earlier in the evening at

a bar by Brenda Jordan, a woman with whom Turner was acquainted and who lived in the

dormitory.[3]

 Ms. Jordan "confronted [Turner] about Officer Facciponti and Officer D'Augostine" and

their warnings to her to "stay away" from him because "he's no good."  Turner Dep. 89:4-8.

Turner testified as follows:

> Q:      [Defendants' counsel]  Okay.  And she told you that Louie
>         Facciponti told her to stay away from you?
> A:      [Turner]  That's correct.
> Q:      All right.  And what else did she tell you?
> A:      Basically he slandered my name, that I was no good, no one
>         liked me in Washington, D.C., all to that effect.
> Q:      Okay.  Well, let's be very clear about what she told you.  She
>         said that [Facciponti] said that she should stay away from you.
>         She said [Facciponti] told her that she should stay away from
>         you.  She said [Facciponti] told her no one liked you in D.C.
>         What else did she tell you?
> A:      Basically, stay away from me, no one liked me in
>         Washington, that I was no good.  That's basically all I can
>         remember.

*Id.* 91:6-21.  He further testified:

> Q:      [Defendants' counsel]  What did you say to her after she told
>         you what Louie Facciponti had said about you?
> A:      [Turner]   I stated that that wasn't true and I don't know why
>         he would say anything like that to her.  And she didn't know
>         why either, because she – you know, she basically said, I
>         don't really know you, it's not like we're dating or going out

---

[3]      Presumably, Ms. Jordan is not the person to whom Turner refers when he alleges in his opposition that "his relationship with a white woman and the only female in the training class appears to be at the core of the enmity that caused the white men to assault him."  Opposition to Motion for Summary Judgment ("Pl.'s Opp'n") at 2; *see* Turner Dep. 96:16-97:15.

> with each other I don't – I guess she got the picture that he
> thought that we were or were in the midst of a casual
> relationship, but it never trans—never came to pass.

*Id.* 96:5-15.  In addition, Turner stated:

> Q:      [Defendants' counsel]   What else did you say to her?
> A:      [Turner]    Basically, she told me to watch my back and to be
>         careful because evidently these people weren't for me, they
>         were basically against me.
> Q:      Well, what do you mean, these people?  She only talked about
>         – let me finish my question.  What do you mean these people?
>         She only talked to you about one person.
> A:      Right.  But I guess she was thinking [D'Augostine] was with
>         [Facciponti] in on it.  They were together.  I'm not sure.

*Id.* 98:1-12.  Shocked, upset, and disappointed, *see id.* at 100:18-20; 101:11, Turner went to

D'Augostine's room to discuss what Ms. Jordan had said to him.

According to Turner, subsequent events unfolded as follows:

> Q:      [Defendants' counsel]   Okay, so a woman has just told you
>         that she's been told, nobody likes you, by Louie Facciponti,
>         and that you should watch you back, and your testimony is
>         that you went in and just very calmly started asking
>         [D'Augostine] about this conversation.
> A:      [Turner]    Yes, I did.
> Q:      Okay.  And what was the first thing you said to him?
> A:      Basically, he said, no, and I said, well, she just told me – and
>         I went into the spiel of what she said, and conversation was
>         getting a little heated.  And he denied he – he stated that he
>         didn't know what I was talking about.  Then I asked
>         [D'Augostine], I said, you were – were you with Officer
>         Facciponti when this conversation took place.  And they both
>         said, no, I don't know what you're talking about.
> Q:      When you say, got heated, what does that mean?
> A:      Meaning – meaning that he was getting a little upset about me
>         asking the conversation.
> Q:      So [Facciponti] was getting upset, but you weren't upset?
> A:      I – I wouldn't say upset.  I was – well, yeah, I guess I would
>         say upset, yeah.
> Q:      Did you start to raise your voice?

A:      Yes – yes.

Turner Dep. 106:3-107:11.  The conversation "turned into an argument."  *Id.* 111:14-15.  At that

point, May stepped in and "grabbed [Turner's] hands from behind."  *Id.* 107:16-17; 112:15-22.

Turner did not recall whether May said anything; he did tell May to remove his hands.  *Id.*

119:10-19.  Facciponti then "jump[ed] in and grabbed [Turner] by the throat."  *Id.* 119:20-21.

According to Turner, as Facciponti approached him, Facciponti said, "Let's kill this nigger."  *Id.*

120:17-19.  May let go of Turner's hands, removed Facciponti's hands from Turner's neck, and

stepped between Turner and Facciponti.  *Id.* 121:16-123:6.  D'Augostine, who had been seated,

stood up "saying something, and he was heated."  *Id.* 123:9-10.  Turner was pointing his finger at

D'Augostine; D'Augostine "grabbed [Turner's] right index finger and twisted it."  *Id.* 123:12-13.

"Everyone is yelling" by this time, and May was trying to calm everyone down.  *Id.* 124:2-10.

Turner left D'Augostine's room and returned to his own room.  Turner Dep. 136:11-13.

He could not find his keys, however, and he went "to [his] car to see if [his] keys were either left

in [the] seat or somewhere."  *Id.* 136:13-16.  On his way to the parking lot, he "ran into the

FLETC police."  *Id.* 136:21.  Turner informed the FLETC officers that he had been attacked.  *Id.*

141:19-22.  He had not called the FLETC police himself, however.  *Id.* 145:2-20.

D'Augostine's, Facciponti's and May's versions of the events were consistent but differ

from Turner's account.  According to D'Augostine, Turner forced his way past May in order to

enter the room.  Turner yelled at D'Augostine and made statements such as, "I know what you

did behind my back," Long Decl., Attach. A (Statement of Sean D'Augostine), and "I'm going to

get you two."  Bowen Decl., Attach. A (D'Augostine Interview) at 2.[4]  D'Augostine did not

---

[4]      The declarations of Donald Long and Bruce J. Bowen are submitted as exhibits to defendants' motion for
summary judgment.

understand what Turner meant; he asked May to "get [Turner] out of here." *Id.* He stated that he heard the "slamming of [Turner's] cup hitting the ground" just before Turner "charged after [him;]" Turner was "able to get . . . his right hand on [D'Augostine's] neck and his left hand on [D'Augostine's] collarbone." *Id.* Facciponti pulled Turner off D'Augostine, and May stepped between Turner and D'Augostine before pushing Turner out the door. According to D'Augostine, there were no punches or kicks. *Id.* He reported that Turner ripped his shirt, tore a gold chain from around his neck, and caused bruising to his chest area. *Id.* at 6, 8-9.

Facciponti, too, recalled that Turner made statements such as, "I know what you've been saying about me" and "you guys been are [sic] trying to turn things around on me." Bowen Decl., Attach. A (Facciponti Interview) at 2. He observed Turner try to enter the room but did not because May was blocking the doorway. *Id.* at 7. Turner "busted through the door . . . [and] basically pushed [] May out of the doorway." *Id.* Turner "was on [D'Augostine] before [Facciponti] could even react. And he had clasped his hands around [D'Augostine's] neck and he was choking [D'Augostine] on the bed." *Id.* Facciponti "grabbed [Turner's] hand closest to him . . . [a]nd tried to pull him away." *Id.* Facciponti stated that he "reverted to like [his] training and [he] went . . . towards [Turner's] thumb and that's how [he] was able to bend [Turner's] thumb. Not physically break it but break the grip via the thumb." *Id.* At that point, Facciponti held Turner in an "escort hold" and "pushed him out of the door." *Id.*

May said that he tried to calm Turner down and encourage him to go back to his room. Bowen Decl., Attach. A (May Interview) at 3. He stated that Turner "threw his drink somewhere out on the sidewalk," then "ran past [May] and jumped on [D'Augostine] who was on the bed and then [] jumped around [D'Augostine's] neck and was choking [D'Augostine] or something."

*Id.* May did not understand what Turner and D'Augostine were arguing about, but recalled Turner "yelling and pointing something about 'you turned your back on me I know what you did.'" *Id.*

D'Augostine, Facciponti, and May believed that Turner was drunk. D'Augostine stated that Turner "was visibly intoxicated and had an alcoholic beverage in his hand when he approached the door" that night. Long Decl., Attach. A (Statement of Sean D'Augostine). According to D'Augostine, Turner "could barely stand up" and "was slurring his speech." Bowen Decl., Attach. A (D'Augostine Interview) at 5. D'Augostine smelled alcohol on Turner's breath, *id.* at 6, and May considered Turner extremely intoxicated. *Id.*, Attach. A (May Interview) at 5. Facciponti realized Turner was drunk when Turner "started speaking and like slurring his words." *Id.*, Attach. A (Facciponti Interview) at 6. Turner admitted that he drank two beers at the Student Center before going to D'Augostine's room but he did not consume mixed drinks, shots, or liquor.[5] He also denied having a drink in his hand when he arrived at D'Augostine's room.

D'Augostine, Facciponti, and May all denied using racial slurs, calling Turner a "nigger," and threatening to kill him. *See* Bowen Decl., Attach. A (D'Augostine Interview at 10; Facciponti Interview at 11; May Interview at 8).

D'Augostine called security to report that he had been assaulted by Turner. Long Decl., Attach. A (Police Incident Report 04-11-10-034, Continuation Narrative). Officer Curtis Copeland was the first to arrive on the scene and to talk with D'Augostine, Facciponti and May.

---

[5] This contradicts Turner's deposition testimony, according to which he drank only one beer. Turner Dep. 88:3-7.

*Id.*  He, along with Officer Rowe, then left the scene to find Turner.[6]  *Id.*  "Upon [e]xiting room 158 [they walked] right into student Turner, he began yelling that he didn't do nothing [sic] that they attacked him."  *Id.*

Subsequently, Turner gave a statement regarding the altercation as follows:

> I Michael L. Turner went to D'Augostine [sic] room to ask them [sic] about a situation that happened Thursday night, and I saw May, D'Augustine, and Facciponti in BLDG 277 Room 158.  I started asking question [sic] about lies they told to an individual and they denied what was said; And D'Augostine started stating that I don't like you and I will kill you know I went to step in the room and May grab me from behind and Facciponi [sic] grab [sic] me by the neck. I tried to get out the best way I could, but it was three on one. Facciponi [sic] told May to kill the nigger!!!!!  As [sic] was walking out D'Augostine went for my throat and I throat [sic] and I pushed him on the bed while May blocked the door.  I turned to Facciponi [sic] and pointed my finger and said he don't pay; and D'Augostine grab [sic] my finger and twisted it.  I threw him off and left.

Long Decl., Attach. A (November 9, 2003 Statement of Michael L. Turner).

According to FLETC's policy on workplace violence, an act of violence includes:

> any intentional infliction of physical harm or attempt to inflict physical harm against another or aggressive or threatening behavior which results in emotional harm or otherwise places a person's safety and productivity at risk, or deliberate tampering or damage to another's possessions or property, including any government property[.]

*Id.*, Attach. D (FLETC Manual 67-01, Workplace Violence Program Management) at 1 (page numbers designated in the manual).  The term "workplace violence" includes "any act or threat of violence committed by an employee . . . against an employee . . . or on FLETC property[.]"  *Id.*  FLETC students are considered employees.  *Id.* at 2.

Robert E. Ray, Chief of FLETC's Training Management and Coordination Division,

---

[6]  The record does not include a statement from Officer Rowe.

recommended Turner's dismissal from USPPI-304 for misconduct.  Long Decl., Attach. A

(November 13, 2003 Memorandum to Bradley W. Smith, Deputy Assistant Director, Office of

Training Management) at 1.  After reviewing statements provided by D'Augostine, Facciponti,

May and Turner, Ray concluded:

> I believe that [Turner's] statement of events is not accurate or credible and is intentionally false.  This determination is supported by the fact that the incident was reported immediately by [D'Augostine, Facciponti and May], and was not ever reported by [Turner].  This determination is supported further by photographs of the individuals, which show significant bruising to [] D'Augostine consistent with the information provide, and no injuries to [Turner], which is consistent with the information provided by [D'Augostine, Facciponti and May], and inconsistent with the information provided by [Turner].

*Id.* at 2.

Donald Long, Senior Policy Project Analyst in the Office of Training Management, acting

on behalf of Bradley Smith, Deputy Assistant Director of the Office of Training Managment,

approved the recommendation to remove Turner "in accordance with FLETC Directive 67-35.C,

Student Misconduct, for actions which violate both that Directive and FLETC Directive 67-01,

Workplace Violence."  Long Decl., Attach. A (November 13, 2003 Memorandum to Bradley W.

Smith) at 1.  In reaching his decision, Long reviewed Turner's FLETC file and Ray's November

13, 2003 Memorandum with attachments regarding the November 8, 2003 altercation.  Long

Decl. ¶¶ 4-6.  Long "did not believe [Turner's] statement of the events [as Long] did not find it to

be accurate or credible."  *Id.* ¶ 7.  To Long, it was significant that D'Augostine, Facciponti, and

May "immediately reported the incident to FLETC security, which indicated to [him] that they

were not the aggressors in the altercation with [Turner]."  *Id.*  In addition, Long found the

photographs of the participants in the altercation to be consistent with the statements of

D'Augustine, Facciponti, and May.  *Id.* ¶ 8.  Long denied making his decision based on Turner's

race.  *Id.* ¶ 10.

Turner appealed Long's decision to remove him from USPPI-304 to Bruce J. Bowen, the

Assistant Director of FLETC's Office of Training.  *See* Bowen Decl. ¶ 3.  Turner argued that the

punishment rendered, that is, removal from FLETC training days before graduation, "was

unusually harsh and unfair."  *Id.*, Attach. B (Feb. 6, 2004 letter from M.E. Fischer).[7]  After

reviewing the November 20, 2003 Special Investigations and Security Division's Report of

Investigation, a memorandum from FLETC's Office of Chief Counsel and other records, Bowen

upheld Turner's removal.  *Id.* ¶ 7.  He concluded that Turner "had violated FLETC workplace

violence policy, and that the violation was a serious one as it was criminal in nature and [Turner]

was in training to become a Park Police Officer."  *Id.* ¶ 8.  Turner, he found, "had committed an

act of violence that warranted his removal from the FLETC training program."  *Id.* ¶ 9.  Bowen

denied that he based his decision on Turner's race.  *Id.* ¶ 10.

## II.  DISCUSSION

### A.  Legal Standards

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment

should be granted only if it is shown "that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

moving party's "initial responsibility" consists of "informing the [trial] court of the basis for its

motion, and identifying those portions of the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, which it believes demonstrate the

---

[7]      Turner was represented by counsel for this appeal.  Turner Dep. 164:14-165:6; *see* Bowen Decl., Attach. B
(February 6, 2004 letter from  M.E. Fischer, Esq.).

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(internal quotation marks omitted).

If the moving party meets its burden, the burden then shifts to the non-moving party to

establish that a genuine issue as to any material fact actually exists. *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To meet his burden, the non-moving party

must show that "'the evidence is such that a reasonable jury could return a verdict'" in his favor.

*Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Such evidence must consist of more than mere

unsupported allegations or denials; rather, the non-moving party must set forth specific facts

showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322 n.3.

If the evidence is "merely colorable" or "not significantly probative," summary judgment should

be granted.  *Anderson*, 477 U.S. at 249-50.

"While summary judgment must be approached with special caution in discrimination

cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or

other competent evidence showing that there is a genuine issue for trial."  *Morgan v. Fed. Home*

*Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (citation omitted).  When a party,

as here, moves for summary judgment, the motion must be "accompanied by a statement of

material facts as to which the moving party contends there is no genuine issue, which shall

include references to the parts of the record relied on to support the statement."  LCvR7(h).  Any

opposition to the motion must "*be accompanied by a separate concise statement of genuine*

*issues setting forth all material facts as to which it is contended there exists a genuine issue*

*necessary to be litigated, which shall include references to the parts of the record relied on to*

11

*support the statement.*"  *Id*. (emphasis added).

The statements of material facts are important.  "[A] district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact."  *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996) (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988), *cert. denied*, 490 U.S. 1066 (1989)).  "In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 7(h).

Here, while defendants' motion for summary judgment was accompanied by a statement of material facts as to which they contend there is no genuine issue and which references the parts of the record relied on to support the statement, plaintiff's opposition does not include a traversing statement.[8]  Thus, the court may and does assume that the facts identified by defendants are admitted.

## B.    Plaintiff's Title VII and § 1981 Claims

Because there is no direct evidence of race discrimination here, Turner's Title VII and § 1981 claims properly are analyzed under the familiar burden-shifting framework established in

[8]    Turner's opposition to defendants' motion for summary judgment is remarkably cursory, consisting of only four pages of the most general and unfocused argument.  More significant, however, is Turner's failure to submit a statement of material facts that he asserts are in dispute with references to the pertinent parts of the record.  It is not an overstatement to say that Turner's opposition amounts to an argument that: (1) anybody can see that the Black recruit was treated unfairly because of his race; and, thus, (2) there is no need to produce evidence that such is so.  Turner is wrong with respect to both propositions.
    Turner moves to file a sur-reply [Dkt. #42] noting his "need[] to supplement the record with [a] statement of material facts to which there is a genuine issue."  Plaintiffs [sic] Motion for Leave to File Response to Defendants' Reply to Plaintiffs' [sic] Opposition to Motion for Summary Judgment, ¶ 4.  The motion is denied for the reasons set forth in defendants' opposition which, the court notes, is not met as it could have been with a reply responding to the defendants' arguments.  As with his other submissions, Turner's motion to file a sur-reply eschews governing principles of law.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[9]  Under this framework, it is a

Turner's initial burden to establish a *prima facie* case of discrimination by a preponderance of the

evidence.  *McDonnell Douglas*, 411 U.S. at 802; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,

506 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  "[A] plaintiff

makes out a *prima facie* case of disparate-treatment discrimination by establishing that: (1) [he]

is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the

unfavorable action gives rise to an inference of discrimination."  *George v. Leavitt*, 407 F.3d 405,

412 (D.C. Cir. 2005).

     If a plaintiff succeeds in making out a *prima facie* case of discrimination, the burden

shifts to the employer to rebut the presumption of discrimination by producing "evidence that the

adverse employment action[] [was] taken for a legitimate, nondiscriminatory reason."  *Aka v.

Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc) (citation omitted); *see

Burdine*, 450 U.S. at 254*; Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir.

2004).  The employer's burden is one of production only, and it "need not persuade the court that

[the employment action] was actually motivated by the proffered reasons."  *Burdine*, 450 U.S. at

254; *see also St. Mary's Honor Ctr.*, 509 U.S. at 509.

     If the employer is successful in carrying its burden, then "the *McDonnell Douglas*

framework – with its presumptions and burdens – disappears, and the sole remaining issue [is]

discrimination *vel non*."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43

(2000) (internal citations and quotation marks omitted); *see Burdine*, 450 U.S. at 256; *Dunaway*

---

[9]      The *McDonnell Douglas* framework governs all of Turner's Title VII and § 1981 claims.  *See, e.g., Berger v. Ironworkers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1412 n.7 (D.C. Cir. 1988) (applying framework to § 1981 claims).

13

*v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002).  At this point, in order to survive

summary judgment, a plaintiff "must show that a reasonable jury could conclude from all of the

evidence that the adverse employment decision was made for a discriminatory reason." *Lathram*

*v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *see also Aka*, 156 F.3d at 1290.  "To make such

a showing, the plaintiff must prove that a reasonable jury could infer that the employer's given

explanation was pretextual and that this pretext shielded discriminatory motives."  *Jackson v.*

*Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007).  A plaintiff may establish pretext "directly by

persuading the court that a discriminatory reason more likely motivated the employer or

indirectly by showing that the employer's proffered explanation is unworthy of credence."

*Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143.

     1.  *Prima Facie Case*

     Defendants argue that Turner does not present evidence sufficient to show that the

circumstances of his removal from the FLETC training program give rise to an inference of

discrimination.  Because Turner fails to make out a *prima facie* case of race discrimination,

defendants argue, he cannot prevail in this suit.

     As is his habit, Turner does not respond directly to defendants' argument.  He suggests,

however, that he makes out a *prima facie* case of discrimination because D'Augostine,

Facciponti and May suffered no consequences stemming from the November 8, 2003 altercation,

and that two White recruits involved in another physical altercation at FLETC neither were

removed nor punished as he was.  The problem for Turner is that he does not present evidence

that would support this method of establishing a *prima facie* case.  It is true that an inference of

discrimination arises when "similarly situated employees outside the protected class are treated

14

more favorably" than a plaintiff alleging discrimination.  *Vargas v. Martinez*, No. 03-1259, 2005

WL 975732, at *2 (D.D.C. Apr. 26, 2005) (quoting *Stella v. Mineta*, 284 F.3d 135, 144-45 (D.C.

Cir. 2002)).  However, this method of proof requires a showing that "the individuals with whom

the plaintiff seeks to compare [his] treatment . . . dealt with the same supervisor, have been

subject to the same standards and have engaged in the same conduct without such differentiating

or mitigating circumstances that would distinguish their conduct or the employer's treatment of

them for it."  *Phillips v. Holladay Prop. Servs*., 937 F. Supp. 32, 37 (D.D.C. 1996) (quoting

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992), *aff'd*, 1997 WL 411695 (D.C. Cir.

June 19, 1997)); *see also Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (plaintiff "must

demonstrate that all of the relevant aspects of [his] employment situation were nearly identical to

those" with whom he compares himself).

Turner's argument based on the treatment of D'Augostine, Facciponti and May fails

because these White recruits are not similarly situated to him.  Unlike Turner, they were not

found to have engaged in misconduct in violation of FLETC directives; they were not found to

have been the aggressors in the altercation.  Turner fails to appreciate that it is not this court's

prerogative to review FLETC's determination that he was the aggressor and thus engaged in

misconduct, other than to determine whether there is evidence to support his assertion that the

determination was infected by racial animus.  Turner presents no such evidence.[10]  Moreover,

Turner cannot rely on innuendo that inheres in his allegation that one of the recruits called him a

"nigger" or his suspicion that their reaction to his relationship with a White woman was at the

---

[10]       In this regard, defendants are correct in observing that "[w]here there is no evidence that illegal
discrimination played a role in an employer's [adverse employment decision], the Court will not sit as a super-
personnel department that rexamines an entity's business decisions."  *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 101
(D.D.C. 2005) (citation and internal quotation marks omitted), *aff'd*, No. 05-5386, 2007 WL 1126199 (D.C. Cir.
Apr. 16, 2007) (per curiam), *petition for cert. filed*, __ U.S.L.W. __ (U.S. Nov. 29, 2007) (No. 07-722).

root of their dislike for him.  Innuendo and suspicion do not substitute for evidence that the decision to remove him from FLETC training was motivated by considerations of race.

Turner's argument that White recruits engaged in a similar physical altercation were treated move favorably than he was here is no more successful.  This argument is based on the testimony of Sergeant Richard Butler, a USPP training coordinator and supervisor of Turner's training class, pertaining to an incident in which two White recruits were "drinking and . . . doing some type of wrestling" in a dorm room.  Butler Dep. 83:7-9.[11]  Sgt. Butler testified:

> Q:   [Defendants' counsel] The prior incident that you gave testimony about two individuals who were – I believe you used the word wrestling – and one ended up being injured in his head, was your understanding regarding that – what was your understanding regarding that incident as to whether there was any intent to injure?
>
> A:   [Sgt. Butler]  Having spoken with the parties at the hospital, the person that initiated – that got hurt had initiated it and told me that he was only fooling around, that he was having fun, and that the other individual involved, who also went to the hospital with him, in talking to them separately, they both said it wasn't an assault.  They were playing around.  He lost his balance and he cracked his head open.  That they didn't mean for that to happen.  They didn't intend to harm each other. They were just exuberantly playing around.  It got out of hand to the sense of somebody got hurt, but they didn't mean for anybody to get hurt, and as soon as that happened, they wanted to get help as soon as possible.  And they knew they were going to have to call me and that's why they did.

*Id*. 97:1-98:3.

Quite clearly the recruits involved in the activity Sgt. Butler describes are not similarly situated to Turner.  Although that incident resulted in a head injury to one recruit, it was determined that neither recruit intended to injure the other; they had been engaged in

---

[11]   Butler's deposition transcript is submitted as an exhibit to Turner's opposition.

"horseplay." Unlike these recruits, Turner was found to have been engaged in assaultive conduct and to have been the aggressor in the physical altercation in which he was involved.

Because Turner fails to show that his removal occurred under circumstances that give rise to an inference of discrimination, he fails to make out a *prima facie* case of discrimination. The court's determination that Turner fails to make out a *prima facie* case is sufficient reason to grant summary judgment. Nevertheless, the court shall proceed to examine whether defendants articulate a nondiscriminatory reason for the decision to remove Turner and, if there is such an explanation, whether there is any evidence upon which a reasonable jury could find that FLETC's explanation is pretextual.

### 2. *Proffered Reason for Removal and Pretext*

The stated reason for Turner's removal from the FLETC training program is the FLETC administrators' determination that he had engaged in misconduct by assaulting D'Augostine. This explanation undoubtedly is sufficient to carry defendants' burden to state a legitimate, nondiscriminatory reason for its action because FLETC trainees are subject to directives that prohibit workplace violence. Further, there is no question that the decisionmakers had reason to believe that Turner had committed an act of misconduct. *See* Defendants' Statement of Facts ¶¶ 6, 10-11, 15-17. Defendants thus rebut Turner's *prima facie* case by producing "evidence that the adverse employment action[] [was] taken for a legitimate, nondiscriminatory reason." *Aka*, 156 F.3d at 1289.

At this point, Turner "must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram*, 336 F.3d at 1088. Again, Turner presents no such evidence. Instead, Turner refers to his own

version of the events surrounding the November 8, 2003 altercation and asserts that a proper

resolution of this case requires a jury determination as to whose account of the altercation is true.

Turner's argument in this regard, in its entirety, is as follows:

> The [defendants argue] that Counts I and IV should be dismissed
> because no legitimate "legitimate issue of material fact" exist.  This
> assertion is at best ludicrous and at worst intellectually dishonest.
> Plaintiff alleges and testified at deposition that he was physically
> assaulted and called "nigger" by three white fellow trainees, Misters
> Facciponti, D"Augostino and May.  The trainees admit to the assault
> but allege plaintiff attacked the three of them.  Plaintiff alleges that
> they assaulted him first.   "Three against one" somehow carries the
> day for the defendants.
> A reasonable jury can clearly find in favor of the one .. Since
> Summary Judgment lies when there is no dispute [defendants']
> Motion should be denied.

Pl.'s Opp'n at 1-2.

Turner's argument is entirely beside the point.  It was not Facciponti, D'Augostino and

May who removed Turner from the FLETC training program; FLETC administrators made this

decision.  That a jury might agree with Turner's version of events says nothing about whether

FLETC administrators believed or had reason to believe that Turner's account was or was not

credible.

In sum, even if it could be said that Turner presents a *prima facie* case of discrimination,

he fails to present evidence upon which a reasonable jury could determine that the benign reason

offered by defendants for his removal was pretext for race discrimination.

### III.   CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.  An appropriate order accompanies this memorandum.


Henry H. Kennedy, Jr.
United States District Judge.

Date:  December 14, 2007